ACQ
R.v. 1197

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>JIMMY KHA, aka Vinh Kha, FELIX KHA, and MAI NGUYEN, and WADE STEFFEN | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>12-0401M |

Complaint for a violation of Title 16, United States Code, Sections 3372(a)(1), 3373(d)(1)(B), 1538(a)(1)(E), 1538(a)(1)(F), 1540(b) (knowing transportation, sale, receipt, acquisition, or purchase of endangered species with a market value in excess of $350 with knowledge that the endangered species were delivered, sold, carried, transported, or shipped in the course of commercial activity and/or were sold or offered for sale in interstate commerce) [COUNTS 2-4]; and Title 18, United States Code, Section 371 (conspiracy to engage in violations of the aforementioned statutes) [COUNT 1]

| NAME OF MAGISTRATE JUDGE<br>JAY C. GANDHI | FILED<br>CLERK, U.S. DISTRICT COURT<br>FEB 1 6 2012<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ DEPUTY | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|---|
| DATE OF OFFENSE<br>8/11 - 2/12 | PLACE OF OFFENSE<br>Los Angeles/Orange and San Bernardino Counties | ADDRESS OF ACCUSED (IF KNOWN) | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

  SEE AFFIDAVIT AND COUNTS LABELED AS ATTACHMENT A

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

  See attached affidavit which is incorporated herein as part of this complaint.

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>LIZZ D'ARLING<br><br>OFFICIAL TITLE<br>SPECIAL AGENT – U.S. FISH & WILDLIFE SERVICE |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>February 16, 2012 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

[AUSA D. MITCHELL]    REC: (1) DETENTION FOR JIMMY KHA, FELIX KHA, and MAI NGUYEN
            (2) $100,000 Bond Secured by AOS by Third Party for WADE STEFFEN

# ATTACHMENT "A"

COUNT ONE

[18 U.S.C. § 371; 16 U.S.C. §§ 1538(a)(1)(E) and (F), 1540(b),

3372(a)(1), 3373(d)(1)(B)]

Between on or about August 2011, and February 2012, in

Orange County, within the Central District of California, and

elsewhere, defendants JARROD WADE STEFFEN, also known as Wade

Steffen, JIMMY KHA, also known as Vinh Kha, FELIX KHA, and MAI

NGUYEN did knowingly, willfully and unlawfully combine, conspire,

confederate and agree together with each other and with others

known and unknown to commit acts in violation of the laws of the

United States, namely, to knowingly transport, sell, receive,

acquire and purchase wildlife, specifically Black rhinoceros

horns, with a market value of more than $350, knowing that it had

been transported and sold in violation of United States law,

specifically the Endangered Species Act, Title 16, U.S.C. §§

1538(a)(1)(E) and (F) and 1540(b).  To accomplish the goal of the

conspiracy, JARROD WADE STEFFEN, would purchase and sell

endangered wildlife species, namely Black Rhinoceros horns in

interstate commerce, sometimes by use of a straw buyer to conceal

the interstate nature of the transaction  Thereafter, to

accomplish and further the goal of the conspiracy, JARROD WADE

STEFFEN, and other unnamed co-conspirators, would transport or

arrange for the interstate transportation of the wildlife to

JIMMY KHA and FELIX KHA, sometimes via MAI NGUYEN.  JIMMY KHA and

FELIX KHA would purchase the wildlife from JARROD WADE STEFFEN

for thousands of dollars, often paid in cash.

COUNT TWO

[16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B); 18 U.S.C. § 2]

On or about October 26, 2011, in Orange County, within the Central District of California, and elsewhere, defendant JARROD WADE STEFFEN, also known as Wade Steffen, did knowingly transport and sell wildlife, namely Black Rhinoceros horns with a market value in excess of $350, knowing that the horns had been first sold to him in interstate commerce by use of an unnamed straw buyer on or about October 14 and 15, 2011, in violation of federal law, namely, the Endangered Species Act, Title 16 United States Code, Sections 1538(a)(1)(F), 1540(b)(1), which prohibit the offering for sale and sale of endangered species of wildlife, including Black Rhinoceros, in interstate commerce. Specifically, defendant JARROD WADE STEFFEN traveled in interstate commerce from Illinois to Forth Worth, Texas, purchased the Black Rhinoceros horns on or about October 14 and 15, 2011, through an unnamed straw buyer he used for the purpose of concealing the fact that he was not a resident of the State of Texas, and thereafter transported and on approximately October 26, 2011, re-sold the illegally sold wildlife.

COUNT THREE

[16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B); 18 U.S.C. §§ 2]

On or about November 1, 2011, in Orange County, within the Central District of California, and elsewhere, defendant JARROD WADE STEFFEN, also known as Wade Steffen, did knowingly transport and sell wildlife, namely Black Rhinoceros horns with a market value in excess of $350, knowing that the horns had been sold to him in violation of federal law, namely, the Endangered Species Act, Title 16 United States Code, Sections 1538(a)(1)(F), 1540(b)(1), which prohibit the offering for sale and sale of endangered species, including Black Rhinoceros, in interstate commerce. Specifically, defendant JARROD WADE STEFFEN traveled in interstate commerce from Illinois to Forth Worth, Texas, purchased the Black Rhinoceros horns on or about October 14 and 15, 2011, through an unnamed straw buyer he used for the purpose of concealing the fact that he was not a resident of the State of Texas, and thereafter transported and on approximately November 1, 2011, re-sold the illegally sold wildlife.

COUNT FOUR

[16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B); 18 U.S.C. §§ 2]

Between on or about October 26, 2011, and on or about November 1, 2011, in Orange County, within the Central District of California, and elsewhere, defendants JIMMY KHA, also known as Vinh Kha, FELIX KHA, and MAI NGUYEN, did knowingly acquire and transport wildlife, namely Black Rhinoceros horns with a market value in excess of $350, knowing that the wildlife had been sold and transported in violation of federal law, namely, the Endangered Species Act, Title 16 United States Code, Sections 1538(a)(1)(E) and (F), 1540(b)(1), which prohibit, in interstate commerce, the delivery, receipt, carriage, transport, and shipment in the course of commercial activity, and the offering for sale and sale of endangered species, including Black Rhinoceros. Specifically, between on or about October 26, 2011, and on or about November 1, 2011, defendants JIMMY KHA, FELIX KHA, and MAI NGUYEN were sold and had transported, shipped, carried and delivered to MAI NGUYEN in California, from Texas, Black Rhinoceros horns for which he paid more then $350. Thereafter, knowing that the Black Rhinoceros horns had been illegally sold, transported, shipped, carried and delivered in interstate commerce, between on or about October 26, 2011, and on or about November 1, 2011, defendant MAI NGUYEN transported the horns to the residence of defendants JIMMY and FELIX KHA. Thereafter, defendants JIMMY and FELIX KHA transported, and

caused to be transported, the horns from their residence to their business at Win Lee Porcelain.

<u>AFFIDAVIT</u>

I, Lizz Darling, being duly sworn, hereby depose and state:

## I.   <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") of the United States Fish and Wildlife Service ("USFWS"), Division of Law Enforcement, which is part of the United States Department of Interior.  I have been employed as a Special Agent since 2004.  Prior to my work as an agent, I was employed as a Wildlife Inspector with the USFWS.  I am presently assigned to the Special Operations office in Denver, Colorado that specializes in long term, complex and undercover investigations.  I have been involved in numerous investigations into both State and Federal violations regarding the unlawful importation of wildlife into the United States.  I received specialized training during the Criminal Investigators Training Program and Special Agent Basic School at the Federal Law Enforcement Training Center.  While at the USFWS, I have participated in various investigations, including the use of confidential sources and undercover officers, electronic and physical surveillance, the execution of search and arrest warrants, and investigative interviews.  Through my training and experience, as well as consultation with other experienced investigators, I have become familiar with the methods of those engaged in illegal wildlife trafficking, smuggling and money laundering and their use of telephones and other devices to

- 1 -

conduct their criminal enterprises. I am also familiar with their techniques to conceal assets and proceeds from their illegal activities. My duties include the enforcement of regulations of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), an international treaty to which the United States is a signatory, as well as enforcement of the Lacey Act, 16 U.S.C. § 3371, et seq., and the Endangered Species Act, 16 U.S.C. § 1531, et seq. The information included in this affidavit is based upon my own investigation and information provided to me by other Law Enforcement personnel. Since this affidavit is intended only to establish probable cause for the issuance of a criminal complaint and arrest warrant, it does not contain all information developed during the course of the investigation.

a.   This affidavit is submitted in support of a criminal complaint and application for arrest warrants for FELIX KHA, JIMMY KHA, MAI NGUYEN, and WADE STEFFEN for criminal violations of the federal Endangered Species Act and Lacey Act related to illegal interstate sales, transport, and acquisition of endangered rhinoceros horn, and conspiracy to commit those crimes, including the following: (1) Title 16, United States Code, Sections 1538(a)(1)(E), 1540(b) (interstate transportation of an endangered species in the course of a commercial activity); (2) Title 16, United States Code, Sections 1538(a)(1)(F), 1540(b)

-2-

(offering to sell or sale of an endangered species in interstate commerce); (3) Title 16, United States Code, Sections 3372(a)(1), 3373(d)(1)(B), 1538(a)(1)(E), 1538(a)(1)(F), 1540(b) (knowing transportation, sale, receipt, acquisition, or purchase of endangered species with a market value in excess of $350 with knowledge that the endangered species were delivered, sold, carried, transported, or shipped in the course of commercial activity and/or were sold or offered for sale in interstate commerce); and (4) Title 18, United States Code, Section 371 (conspiracy to engage in violations of the aforementioned statutes). See Attached Statement of Counts One through Four.

## II.   BASIS FOR FACTS SET FORTH IN THIS AFFIDAVIT

2.   I am a member of a team of agents working on an investigation known as "OPERATION CRASH." A "crash" is the term for a herd of rhinoceros. In sum and substance, OPERATION CRASH is designed to detect, investigate, prosecute and deter those engaged in the illegal killing of rhinoceros and the unlawful trafficking of rhinoceros horns.

3.   In sum and substance, and as set forth below, the USFWS has obtained evidence and information regarding the illegal trafficking in rhinoceros horns and related crimes including smuggling and violations of the Lacey Act and the Endangered Species Act by various individuals and businesses in the United States. I make this affidavit based upon personal knowledge

- 3 -

derived from my participation in this investigation and from my coordination with USFWS Special Agents assigned to OPERATION CRASH. Conclusions I have reached are based on my training, experience, and upon information I believe to be reliable from the following sources: (1) Oral reports, written reports (including those that have transcribed statements from recorded conversations), and/or affidavits prepared by one or more federal agents and/or local law enforcement officers; (2) physical surveillance that I and/or other federal agents have conducted; (3) information provided by confidential sources; (4) telephone records; (5) search warrants; (6) information obtained from Special Agents working undercover; (7) travel records; (8) records of the mailing and delivery of packages; (9) surveillance and surveillance videos; and (10) records obtained from various sources.

III. **EXECUTIVE SUMMARY**

4.    As set forth below, this portion of OPERATION CRASH concerns VINH CHOUNG KHA, (A/K/A/ JIMMY KHA), FELIX KHA, NHU MAI NGUYEN (A/K/A MAI NGUYEN), and those with whom they are engaged in the illegal trade of rhinoceros horns, including but not limited to JARROD WADE STEFFEN (A/K/A WADE STEFFEN), MOLLY STEFFEN (A/K/A MOLLY BLACKBURN), MERRILY STEFFEN (collectively "the STEFFEN GROUP").

5.    JIMMY KHA is an Asian male of Vietnamese extraction,

-4-

approximately age 49, and the father of FELIX KHA. JIMMY KHA is a United States citizen who lives in Garden Grove, California. According to California Secretary of State business records, VINH CHUONG KHA (JIMMY KHA) is listed as the agent for service of process for WIN LEE CORPORATION, doing business as WIN LEE PORCELAIN. WIN LEE PORCELAIN is located at 9641 Bolsa Avenue, Westminster, California 92683. According to a WIN LEE CORPORATION business card, which was obtained from within the WIN LEE PORCELAIN business shop, WIN LEE is in the import business. JIMMY KHA is the boyfriend of MAI NGUYEN. FELIX KHA is the son of JIMMY KHA and also works at WIN LEE CORPORATION.

6.     FELIX KHA and JIMMY KHA have received packages at WIN LEE CORPORATION that have been sent by suppliers of rhinoceros horns located in other states. Additional packages have been sent to JOLINE'S NAILS which is owned by MAI NGUYEN, who is the girlfriend of JIMMY KHA. Surveillance on at least three occasions has revealed that packages delivered to JOLINE'S NAILS, are transported by MAI NGUYEN to the KHA home. Evidence obtained in this investigation indicates that JIMMY KHA and FELIX KHA have been involved in purchasing rhinoceros horns from various sources since at least 2008.

        a.     Records obtained from Federal Express ("FedEx") and United Parcel Service ("UPS") show packages being sent to the KHAs at their business by known dealers of rhinoceros horns since

- 5 -

at least 2009. Search warrants executed as part of OPERATION CRASH have resulted in the inspection of packages sent by Fed Ex or UPS to JOLINE'S NAILS and by the United States Postal Service to WIN LEE CORPORATION.

b.    The packages sent to JOLINE'S NAILS were primarily sent by the STEFFEN GROUP which consists of WADE STEFFEN, his mother, MERRILY STEFFEN, and his wife, MOLLY BLACKBURN, whom he married in December 2011 and is now also known as MOLLY STEFFEN (hereafter referred to as "MOLLY STEFFEN").

7.    On February 7, 2012, WADE STEFFEN, MOLLY STEFFEN and MERRILY STEFFEN traveled to Long Beach, California.  The STEFFEN GROUP had recently sent four packages containing a total of seven rhinoceros horns to JOLINE'S NAILS on January 23, 2012, January 25, 2012, February 1, 2012, and February 2, 2012.  As set forth below, these packages were opened pursuant to federal search warrants authorized in the Central District of California.  At least one of the horns has been identified, based upon photographic review by a USFWS Forensic Scientist, as being from Black Rhinoceros.

a.    During their visit to California, the STEFFEN GROUP was observed by USFWS Special Agents visiting the WIN LEE PORCELAIN business and afterward meeting at a sea food restaurant with FELIX KHA and MAI NGUYEN.

b.    On February 9, 2012, acting on a tip alleging that

-6-

the STEFFEN GROUP would be carrying a large sum of cash, USFWS SAs notified the Transportation Security Agency ("TSA") at the Long Beach Airport in California. Thereafter, when the STEFFEN GROUP went through airport security, one or more TSA Officers found organic matter being carried by one or more members of the STEFFEN GROUP. Thereafter, the STEFFEN GROUP's carry-on baggage was inspected, and TSA Officers found approximately $300,000 in $100 bills concealed in various places.

c. The cash was seized by the Long Beach Police Department. Two safety deposit keys found in MOLLY STEFFEN's purse were also seized. MERRILY STEFFEN provided consent to search her camera in which Long Beach Police officers observed photographs of rhinoceros horns and, separately, photographs of large sums of money. The photographs of cash were taken on August 10, 2011, and November 28, 2011, according to the metadata information stored on the card, and appear to show stacks of $100 bills bound with rubber bands.

8. The KHAs also have obtained rhinoceros horns from JIM LOLLI, an owner of LOLLI BROTHERS in Macon, Missouri. As set forth below, records obtained from the United States Postal Service show that JIM LOLLI has mailed 19 packages from Macon, Missouri, to WIN LEE CORPORATION, in California since January 26, 2010. Seven of the known packages have been opened pursuant to federally authorized search warrants in the Central District of

-7-

California and found a total of 18 rhinoceros horns.   One of those horns has been determined, after genetic testing, to be of Black Rhinoceros, and another horn, based upon photographic review by a USFWS Forensic Scientist, has also been found to be from Black Rhinoceros.

9.   I have extensive knowledge on rhinoceros and the illegal trade of Rhinoceros.   Rhinoceros are an herbivore species of prehistoric origin characterized by their enormous size, leathery skin and horns.   Rhinoceros are "living fossils" and one of the largest remaining mega-fauna on earth.   All species of rhinoceros are protected under U.S. and international law.   All Black rhinoceros species are endangered.   The horns are actually composed of keratin, the same type of protein that makes up hair and fingernails.   Both African species and the Sumatran Rhinoceros have two horns, while the Indian and Javan Rhinoceros have a single horn.

10.   I am informed that rhinoceros horn is a highly valued and sought after commodity despite the fact that international trade has been largely banned since 1976.   The demand for rhinoceros horn, which is used by some cultures for ornamental carvings, good luck charms, or alleged Asian medicinal purposes has resulted in a thriving black market.   Consequently, humans as the only known predator of rhinoceros, are causing most species of rhinoceros to be extinct or on the brink of extinction.

- 8 -

11.  I am informed that the black market price for rhinoceros horn is as high as approximately $25,000 per pound. Rhinoceros horn is believed in some Asian cultures to have health benefits.  In Vietnam, in particular, there have been recent claims by some that rhinoceros horn can cure cancer.  Rhinoceros horn also is believed to bring good luck and is highly sought after as ornaments.  Based upon my experience, training and research, and/or from what I have learned in this investigation, I understand that China and Vietnam are the among the largest known markets for rhinoceros horn and that there is no significant end market in the United States.

IV.  **PURPOSE OF AFFIDAVIT**

12.  This affidavit is made for the purpose of establishing probable cause to show that FELIX KHA, JIMMY KHA, MAI NGUYEN, WADE STEFFEN, MERRILY STEFFEN, MOLLY STEFFEN, and others known and unknown have conspired to violate the laws of the United States, in violation of  18 U.S.C. § 371, including:

a. Illegal wildlife trade, in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(B); and

b. Illegal wildlife trade, in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1538(a)(1)(E), 1540(b) (to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species) and

16 U.S.C. §§ 1538(a)(1)(F), 1540(b) (to offer to sell, or sell, an endangered species in interstate commerce).

13.   This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. This affidavit does not contain all of the facts that I have learned during the course of OPERATION CRASH or my investigation in this matter.

## V.   OVERVIEW OF APPLICABLE LAWS

14.   The Lacey Act makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any wildlife, taken, possessed, transported, or sold in violation of foreign law, United States law or treaty of the United States.  16 U.S.C. §§ 3372(a)(1); 3372(a)(2)(A).  The Lacey Act also makes it unlawful for a person to make or submit any false record, account or label for, or any false identification of, any wildlife which has been, or is intended to be, imported, exported, transported, sold, purchased or received from any foreign country or transported in interstate or foreign commerce. 16 U.S.C. §§ 3372(d)(1)..

15.   The Endangered Species Act ("ESA") (16 U.S.C. §§ 1531

- 10 -

et seq.) was enacted to provide a program for the conservation of endangered species and threatened species. The ESA makes it a misdemeanor crime for any person subject to the jurisdiction of the United States, to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species. 16 U.S.C. §§ 1538(a)(1)(E), 1540(b). In addition, under 16 U.S.C. §§ 1538(a)(1)(F), 1540(b) it is a criminal violation for any person to offer to sell, or sell, an endangered species in interstate commerce. Under the ESA the term "endangered species" includes any species, or part thereof, included on the Endangered Species List, which is set forth in the Code of Federal Regulations. See also 16 U.S.C. §§ 1532(8) (defining the term "fish or wildlife" as including any member of the animal kingdom, including the dead body or parts thereof), 1532(16) (defining the term "species" as including any subspecies of fish or wildlife), 1532(6) (defining the term "endangered species" as any species that is in danger of extinction throughout all or a significant portion of its range) and 1533 (authorizing the Secretary of the Interior to designate a species as an endangered species based on certain factors). The species *Diceros bicornis*, which is commonly known as the Black Rhinoceros was added to the Endangered Species List on July 1, 1975. See 50 Code of Federal Regulations ("CFR") § 17.11 (setting forth

- 11 -

species included on the Endangered Species List).[1]

16.   Rhinoceros horn is a highly valued and sought after commodity despite the fact that trade in it is regulated under the Convention on International Trade in Endangered Species ("CITES") since 1976.  CITES is a treaty providing protection to fish, wildlife, and plants that are or may become imperiled due to the demands of international markets.  CITES has been signed by over 175 countries around the world.  CITES is implemented under the authority of the Endangered Species Act and the regulations promulgated thereunder.  16 U.S.C. § 1538(c); 50 C.F.R. Parts 14 and 23.  According to a search of USFWS databases by law enforcement  the USFWS has not issued any CITES export certificates to JIM LOLLI and the other individuals referenced above.

VI.   STATEMENT OF PROBABLE CAUSE

   A.   <u>STEFFEN GROUP Visit to KHA GROUP and Seizure of Cash</u>

17.   On February 9, 2012, TSA inspected the carry-on luggage of WADE STEFFEN, MOLLY STEFFEN and MERRILY STEFFEN on their departure from the airport in Long Beach, California.  TSA found a large amount of cash in $100 bills and alerted the Long Beach Police Department which interviewed the STEFFEN GROUP.  The cash

---

[1] The Southern White rhinoceros is not on the Endangered Species List; however, I am informed that the USFWS is not able to distinguish, with testing DNA, a Southern White Rhinoceros from the Northern White rhinoceros, which is endangered.

was found in 3 different carry-on bags with additional money located in MOLLY STEFFEN's purse and MERRILY STEFFEN's purse.

18.   As more fully described below, JIMMY KHA AND FELIX KHA have a history of receiving packages containing rhinoceros horns from WADE STEFFEN, MOLLY STEFFEN, and MERRILY STEFFEN via delivery to MAI NGUYEN'S nail salon, JOLINE's NAILS.   The STEFFEN GROUP's visit to California took place after four packages containing a total of seven rhinoceros horns had been sent to JOLINE'S NAILS (January 23, 2012, January 25, 2012, February 1, 2012, and February 2, 2012).   Two of the horns have been identified as Black rhinoceros horns based on photographic review by a USFWS Forensic Scientist.

19.   According to the police report by Long Beach Police Officer Oscar A. Valenzuela, during a break in WADE STEFFEN's interview, Long Beach Police, Officer Valenzuela observed WADE STEFFEN talking on his cell phone.   According to Officer Valenzuela's police report, WADE STEFFEN was trying to speak quietly but was overheard to say something about his account and to say "5,000."   Officer Valenzuela saw WADE STEFFEN holding his wallet and looking at what appeared to be a credit card.   It appeared that he was trying to be discrete, but realized that he had been observed.   As Officer Valenzuela approached, WADE STEFFEN stated "thank you" and ended the call.   Officer Valenzuela feared that WADE STEFFEN was trying to hinder the investigation and took the wallet and phone.   He observed that

- 13 -

the card was a Visa debit card from the First National Bank of
Hico. WADE STEFFEN signed a consent to search form. In addition
to the cash, a receipt was found for United Parcel Service next
day delivery. The receipt was for an item weighing 16.96 lbs
with a declared value of $400. The description of goods
indicated that the items shipped were antiques. According to the
receipt, the package was shipped by WADE STEFFEN from his
parents' address in Richmond, Illinois and sent to JOLINE NAILS
in Highland, California.

20. According to a police report by Officer Valenzuela,
MOLLY STEFFEN signed a consent to search form. Upon subsequent
inspection, approximately $20,000 in cash was found in MOLLY
STEFFEN's purse. When MOLLY STEFFEN saw the officer find two
stacks of $100 bills, she indicated that she did not know the
money was in her purse and assumed her husband put it there. In
a signed Disclaimer of Ownership of Currency form, she wrote: "I
assume my husband put it in my purse." She also indicated "That
money is not mine." And "Its from his accounts." The search
also found two safety deposit keys each in an envelope indicating
that it was from the First National Bank in Hico, Texas. The
warnings regarding loss of keys printed on the envelopes suggests
that there are two keys for each safety deposit box.

21. According to a report by Officer Jones, MERRILY STEFFEN
signed a consent to search form and a camera was found in her
bag. According to Officer Valenzuela, the camera memory card has

photographs depicting large stacks of U.S. currency. The
photographs of cash were taken on August 10, 2011, and November
28, 2011, according to the metadata information stored on the
card and each appears to show stacks of $100 bills bound with
rubber bands. The same memory card also contained photographs of
rhinoceros horns being weighed on scales. I am informed that
WADE STEFFEN and MERILLY STEFFEN traveled by air to Long Beach,
California on August 9, 2011. I am also informed that MERILLY
STEFFEN accessed her safety deposit box on August 11, 2011.
Based on my training and experience, I am aware that those
knowingly involved in illegal transactions primarily use cash to
conduct their illegal business. Additionally, a common method
used to store and conceal the volumes of cash that the STEFFEN
GROUP has been known to possess is safety deposit boxes.

22. According to reports prepared by Long Beach Police
Officers Jones and Valenzuela, based on their training and
experience, subjects involved in illegal activity that generate
large amounts of proceeds use safe deposit boxes. They typically
store illegal proceeds in them. One of the reasons subjects
place cash in safe deposit boxes is to avoid law enforcement
detection. They are typically unable to provide a legitimate
reason or source of how the money was obtained. They know that
if they deposit large amounts of money into a regular financial
institution, that law enforcement may be alerted. If law
enforcement is alerted, they know that they can be subject to

investigation.  Based on my training and experience, I agree with

these observations made the by the officers of the Long Beach

Police Department.

**B.   Receipt of Rhinoceros Horns by the KHA GROUP**

23.   As set forth in the table below, Operation Crash has

obtained seventeen search warrants for parcels sent to either

JOLINE NAILS or WIN LEE CORPORATION in the Central District of

California since August 25, 2011.  Of the seventeen search

warrants that were obtained, seven were addressed to WIN LEE

CORPORATION and ten were addressed to JOLINE NAILS.[1]  All of the

packages that were examined pursuant to a search warrant and

addressed to WIN LEE CORPORATION were sent by JIM LOLLI.  All of

the packages addressed to JOLINE NAILS were from WADE STEFFEN or

those associated with STEFFEN (i.e., MOLLY BLACKBURN, MERRILY

STEFFEN).[2]  A total of thirty-seven (37) horns were contained in

---

[1] I am informed that while presenting an affidavit for one
parcel, which was referred to in the affidavit for search warrant
as SUBJECT PARCEL 14, the government became aware that SUBJECT
PARCEL 14 was no longer available for interception and search.
Accordingly, the case agent informed Magistrate Judge Walsh that
a warrant would not be sought by the government.


[2] Government counsel, based upon the information known to
government counsel at the present time, believes that a seizure
and search of a package conducted by a local law enforcement
detective on June 14, 2011 and July 27, 2011 were likely
unauthorized and/or conducted in violation of the Fourth
Amendment to the United States Constitution.  Each of those
packages was sent by WADE STEFFEN to JOLINE NAILS.  Government
counsel submits to the reviewing United States Magistrate Judge
that targets of this particular investigation, such as FELIX KHA,
JIMMY KHA, LOLLI BROTHERS, JIM LOLLI, MERILLY STEFFEN, RANDY
STEFFEN, and MOLLY STEFFEN do not have standing to object to this

the packages that were opened by USFWS Special Agents.  Of those horns, ten have been identified or preliminarily identified as that of a white rhinoceros or could not be identified.  The following table indicates the results of genetic testing and/or photographic review by a USFWS Forensic Scientist.  I am informed that genetic testing is more accurate than photographic review. Those horns indicated as having no result are from rhinoceros, for which genetic testing did not reveal the type of species of rhinoceros.  The results below which have a ** symbol are based upon photographic review by a USFWS Forensic Scientist.  Genetic testing for those horns has not yet been received.


## TABLE OF PACKAGE SEARCH WARRANTS ("SW")

---

unauthorized seizure and search because they did not have any subjective and reasonable expectation of privacy in the package searched.  These individuals do not have standing to object to the violative search when they do not have a subjective and reasonable expectation of privacy in the area searched or the evidence seized.  See Rawlings v. Kentucky, 448 U.S. 98, 104-105 (1980) (no subjective expectation of privacy and thus no standing to challenge admissibility of drugs seized from acquaintance's purse).  On this basis, the government submits that there is no "taint" associated with the probable cause observations made as the result of Detective Hague's seizure and search with respect to FELIX KHA, JIMMY KHA, LOLLI BROTHERS, JIM LOLLI, MERILLY STEFFEN, and MOLLY STEFFEN.  However, the government also views both WADE STEFFEN and MAI NGUYEN as targets in this investigation and acknowledges that those individuals may have standing to object to the local detective's search and seizure.  The information obtained from those unauthorized searches is not set forth in this affidavit.

|  | DATE of SW | FROM | TO | Mail Service | #/TYPE | Magistrate-Judge |
|---|---|---|---|---|---|---|
| 1. | 08-27-11 | Jim Lolli | Win Lee | USPS | 1 Black 1 no result | F. Mumm, J. |
| 2. | 09-03-11 | Merrily Steffen | Joline's Nails | UPS | 2 White | A. Rosenberg, J. |
| 3. | 09-03-11 | Jim Lolli | Win Lee | USPS | 4 White 2 Unknown | A. Rosenberg, J. |
| 4. | 09-15-11 | Wade Steffen | Joline's Nails | FedEx | 2 No results | F. Mumm, J. |
| 5. | 09-22-11 | Molly Blackburn | Joline's Nails | UPS | 2 Black | R. Zarefsky, J. |
| 6. | 10-06-11 | Jim Lolli | Win Lee | USPS | 1 White 1 no result | A. Wistrich, J. |
| 7. | 10-07-11 | Jim Lolli | Win Lee | USPS | 1 White 1 no result | A. Wistrich, J. |
| 8. | 10-13-11 | Molly Blackburn | Joline's Nails | FedEx | 2 Black | S. Segal, J. |
| 9. | 10-26-11 | Molly Blackburn | Joline's Nails | UPS | 2 Black** | F. Olguin, J. |
| 10. | 11-01-11 | Anonymous Stephenville, Texas | Joline's Nails | FedEx | 1 Black 1 no result | P. Walsh, J. |
| 11. | 11-01-11 | Jim Lolli | Win Lee | USPS | 2 White | P. Walsh, J. |
| 12. | 11-16-11 | Jim Lolli | Win Lee | USPS | 1 Black** 1 no result | A. Wistrich, J. |
| 13. | 12-13-11 | Jim Lolli | Win Lee | USPS | 2 White** | J. McDermott, J. |
| 14. | 12-23-11 | Jim Lolli | Win Lee | USPS | No search |  |
| 15. | 01-23-12 | Wade Steffen | Joline's Nails | UPS | 2 Black** | F. Mumm, J. |

| 16. | 01-25-12 | Wade Steffen | Joline's Nails | UPS | 2 White** | F. Olguin, J. |
| 17. | 02-01-12 | Merrily Steffen | Joline's Nails | FedEx | 1 no results** | F. Olguin, J. |
| 18. | 02-02-12 | Merrily Steffen | Joline's Nails | UPS | 2 White** | F. Olguin, J. |

## C.   Summary of Additional Records Obtained from Mail Services

24.   Records obtained from FedEx, UPS and the U.S. Postal Service relating to packages delivered to WIN LEE CORPORATION and JOLINE NAILS revealed that there were many additional shipments, I assume also contained rhinoceros horns. However, the actual content is not known because these packages were not opened by law enforcement. That said, they appeared to have been mailed in a manner consistent with those that were found to have contained rhinoceros horns.

25.   Records obtained from FedEx relating to packages delivered to WIN LEE CORPORATION and JOLINE NAILS show the following:

a.   Between January 2010 and November 2011, WADE STEFFEN was listed as sender on thirteen (13) packages, Molly STEFFEN (Blackburn) was listed as the sender on one (1) package and Merrily STEFFEN was listed as the sender on four (4) packages. WADE STEFFEN is believed to be the sender of an additional six (6) packages based upon the fact that the packages were sent from the same shipping businesses located in Texas and

- 19 -

Illinois that he used to send packages that were subject to search warrant;

b.   Between January 2010 and August 2011, JIM LOLLI and/or LOLLI BROTHERS were listed as the sender on five (5) packages;

c.   Between October 2010 and April 2011, JOHN BROMMEL, the known owner of The Corner Shoppe, in Austin, Texas and also the coordinator of World Class Big Game Trophy Mount and Western Auction in Fort Worth, Texas, which has auctioned off Black rhinoceros taxidermy mounts, was listed as the sender on five (5) packages; and

d.   Between August 2010 and April 2011, FELIX KHA is listed on the sender of five packages mailed from various parts of the country by FELIX KHA to JIMMY KHA at WIN LEE CORPORATION.

26.   Records obtained from UPS relating to packages delivered to WIN LEE CORPORATION and JOLINE NAILS show the following:

a.   Between January 2010 and November 2011, four (4) packages were mailed from various locations in Texas and Illinois from the same shipping businesses located in Texas and Illinois that WADE STEFFEN used to send packages that were subject to search warrant; and

b.   On April 19, 2011, JOHN BROMMEL was listed as the sender on one (1) package.

27.   Records obtained from U.S. Postal Service relating to

- 20 -

packages delivered to WIN LEE CORPORATION revealed that between
January 2010 and August 2011, JIM LOLLI and/or LOLLI BROTHERS
were listed as the sender on 11 packages.

### D.   Role of MAI NGUYEN

28.   As set forth above, MAI NGUYEN's nail salon, JOLINE's
NAILS, has been a delivery location for packages from the STEFFEN
GROUP.  As set forth below, it appears that MAI NGUYEN has been
directly involved in the trafficking of rhinoceros horns.  She
has made deposits of approximately $580,500 over a sixteen month
period that appear inconsistent with her business at JOLINE's
NAILS and has made trips to Missouri and Texas that appear to be
related to purchases and/or payment for rhinoceros horns.  As set
forth below, MAI NGUYEN has been observed to be actively engaged
in the KHA's illegal activities.

29.   On August 18, 2011 and August 23, 2011, USFWS Special
Agents conducted surveillance on JIMMY KHA and MAI NGUYEN and
observed them traveling from Long Beach Airport, Long Beach, CA,
to Kansas City, MO.  USFWS Special Agents in Missouri continued
the surveillance and observed that JIMMY KHA and MAI NGUYEN were
picked up from the airport and transported to a hotel in a
vehicle registered to a DARIN SCOTT ZIEBARTH ("ZIEBARTH") of
Macon, Missouri.  On August 18, 2011, they were accompanied by
the son of JIMMY KHA and younger brother of FELIX KHA.  USFWS
Special Agents have confirmed that ZIEBARTH was the driver of the
vehicle based upon a review of ZIEBARTH driver's license obtained

- 21 -

from the State of Missouri.  A search of publicly available information has determined that ZIEBARTH is a former Chief of Police in Macon, MO.  ZIEBARTH's current status with that police department has not been determined; however ZIEBARTH was observed by a USFWS SA to be driving a police vehicle on September 26, 2011.

30.  On September 26, 2011 and December 20, 2011, USFWS Special Agents conducted surveillance on MAI NGUYEN and observed her travelling from Long Beach Airport, Long Beach, CA, to Kansas City, MO.  On September 26, 2011, MAI NGUYEN was observed being picked up from the airport by ZIEBARTH and taken to a hotel.

31.  On October 5, 2011, I and USFWS SA Laura Chee conducted surveillance at the Long Beach Airport.  WADE STEFFEN was due to arrive from Dallas, TX, and MERRILY STEFFEN was due to arrive from Chicago, Illinois.  I observed MAI NGUYEN arrive at the airport and greet WADE STEFFEN and MERRILY STEFFEN.  I also observed all three of them walk to the airport parking area where they met and left with JIMMY KHA, who was driving a black BMW.

32.  I am informed that on October 13, 2011, USFWS Resident Agent in Charge David Hubbard and other law enforcement personnel conducted covert surveillance of MAI NGUYEN who arrived at the airport in Austin, Texas, from Long Beach, California.  NGUYEN was observed coming off her flight, making a few phone calls and being picked up at the airport, in a white Dodge Ram 3500 pickup, Illinois license plate 298 785, registered to and being driven by

WADE STEFFEN. STEFFEN and NGUYEN were observed being together for
approximately four minutes in STEFFEN's truck during which time
STEFFEN drove in a circle leaving the airport by way of the
"return to terminal" exit and then back to the terminal where
NGUYEN exited the vehicle and went inside the terminal.  NGUYEN
then flew back to Long Beach, California.  Agents continued
surveillance of WADE STEFFEN who drove to a FedEx Ship and Print
store in Austin, Texas, where he was seen entering or depositing
packages.  Once STEFFEN left the FedEx store, SA's went into the
business and took photos of the labels of the two packages which
STEFFEN had shipped.  One of these packages was being shipped
from MOLLY BLACKBURN to JOLINE NAILS, 7223 Church Street, Unit A-
2, Highland, CA, 92346.  USFWS Agents obtained a federal search
warrant for this package (which identified as SUBJECT PARCEL 8
and which was later determined to  contain two Black rhinoceros
horns.

        33.  On January 23, 2012, USFWS agents examined the contents
of a package (which was identified as SUBJECT PARCEL 15) pursuant
to a federal search warrant obtained that same day that was sent
by UPS from WADE STEFFEN in Stephenville, Texas, to JOLINE NAILS.
Based upon photographic review by a USFWS Forensic Scientist,
both horns found inside the package were determined to be from
Black rhinoceros.  USFWS SA's then conducted covert surveillance
after the package was delivered to JOLINE NAILS.  At
approximately 7:07 p.m. Pacific Time, the officers observed

- 23 -

NGUYEN exit JOLINE NAILS carrying a large box that was similar in size and shape to the package that was searched the previous day. The agents observed NGUYEN place the large box into a Honda CRV, license plate number 5NDV544, drive to her residence, pick up a passenger, and then proceed to the residence of JIMMY KHA and FELIX KHA.  The SA's observed MAI NGUYEN's passenger carry the package into the KHA residence.

34.  On January 25, 2012, I examined a package (SUBJECT PARCEL 16) sent from WADE STEFFEN to JOLINE NAILS pursuant to a federal search warrant issued that same day.  The package was sent via UPS from an Office Depot/Copy Center in Fort Collins, Colorado (but stated that it was from Tennessee).  Based upon photographic review by a USFWS Forensic Scientist, the larger horn appeared to be that of a white rhinoceros and the smaller horn could not be identified.

a.  The following day, January 26, 2012, USFWS Special Agents conducted covert surveillance at JOLINE NAILS.  At approximately 7:08 p.m., the SA's observed MAI NGUYEN exit the business carrying what appeared to be a package similar in shape to the package searched the day before.  MAI NGUYEN was observed on a surveillance video putting something into her car that was consistent with the package.  At approximately 10:11 p.m., the SA's observed a vehicle pull into the driveway of the KHA residence.  The SA's observed NGUYEN, along with three

- 24 -

passengers, exit the vehicle.  One of the passengers was observed

carrying a package, believed to be the same package searched the

day before and delivered to JOLINE NAILS earlier that day, from

the car and into the KHA residence.  The other subjects appeared

to carry plastic bags into the residence.  Within minutes of

arriving, NGUYEN and her three passengers got back into the

vehicle and left, without the package.

E.   **Financial Records Linking the KHA GROUP to the STEFFEN
     GROUP  and JIM LOLLI**

35.  OPERATION CRASH has involved an ongoing examination of

financial records of certain individuals including JIMMY KHA,

FELIX KHA, MAI NGUYEN, WADE STEFFEN, MOLLY STEFFEN, MERRILY

STEFFEN, JIM LOLLI, and others engaged in the purchase and sale

of rhinoceros horns.

36.  USFWS Special Agents Justin Mays, Mike Merida and I

have reviewed the records obtained thus far which include certain

bank accounts for certain periods of time and travel records

concerning certain individuals including the following:  FELIX

KHA (WELLS FARGO), JIMMY KHA (WELLS FARGO), JIMMY KHA (CATHAY

BANK), WIN LEE CORPORATION/JIMMY KHA (CATHAY BANK), MAI NGUYEN

(CHASE), MAI NGUYEN (WELLS FARGO), WADE AND MERRILY STEFFEN (BANK

OF AMERICA), WADE STEFFEN (McHENRY SAVINGS), MERRILY STEFFEN

(McHENRY SAVINGS), WADE STEFFEN AND MERRILY STEFFEN (McHENRY

SAVINGS), MOLLY BLACKBURN, aka MOLLY STEFFEN, (BANK OF AMERICA),

LOLLI BROTHERS LIVESTOCK SPECIAL SALES (ATLANTA STATE BANK),

LOLLI BROTHERS LIVESTOCK AUCTION EXPENSE ACCOUNT (ATLANTA STATE
BANK).  This list does not include additional bank accounts that
do not at this time appear to be involved in rhinoceros related
transactions.

37.  Below is a summary of some of the observed transactions
from the records obtained thus far.  As set forth below, there
are transactions showing deposits by both JIMMY KHA and FELIX KHA
in foreign accounts located in China.  It is not known whether
these accounts are those owned by JIMMY and/or FELIX KHA or
whether they are someone else's accounts.  Furthermore, certain
individuals, including FELIX KHA, JIMMY KHA, WADE STEFFEN,
MERRILY STEFFEN, have financial transactions that appear
structured in ordered to avoid the federal Currency Transaction
Report (CTR) requirement for transactions exceeding $10,000.
Based on my experience and training, these transactions,
typically in the range of $9,000 to $10,000, are indicative of
money laundering and those seeking to conceal their activities
from law enforcement.

38.  Additionally, the record of transactions shows that
there are many more known mailings of packages indicating
transactions between the STEFFEN GROUP and the KHA GROUP than
there are financial transactions between these groups.  As a
result, there is probable cause to believe that these individuals
are engaged in cash transactions, indicative of money laundering,

that are not recorded.

39.  A review of the two accounts maintained by JIMMY KHA (WELLS FARGO and CATHAY BANK) and a third account in the name of WIN LEE CORPORATION that is maintained by JIMMY KHA (CATHAY BANK), shows that transactions with traffickers in rhinoceros horns ceased in these accounts in or about July 2010.  It appears that as of that date, either his transactions are being concealed or are being made from another account not known to the government or maintained in another person's name.

a.  A review of JIMMY KHA's bank records for the period from January 22, 2009 to August 1, 2011 show 5 wire transfers totaling $96,520 to a bank account in China; 38 deposits between $9,000 and the $10,000 CTR requirement; 73 deposits by WIN LEE CORPORATION totaling $380,600;  57 deposits into two separate accounts totaling $399,500; and 13 wire transfers totaling $135,400 to JIM LOLLI.  Travel records obtained from Southwest Airlines, Delta Airlines, Continental Airlines, U.S. Airways, JetBlue, and Frontier Airlines, show that between February 2008 and February 2012, JIMMY KHA has traveled by plane ten times to China for a total approximate time of nine and a half months. Travel records also show that between February 2011 and August 2011, JIMMY KHA traveled by plane three times to Missouri.

40.   A review of FELIX KHA's bank records for the period
from January 2009 to November 2011, indicate 5 wire transfers
totaling $52,500 to a bank account in China, 29 deposits between
$9,000 and $10,000 CTR requirement; 65 cash deposits totaling
$331,700; 9 wire transfers totaling $79,500 to WADE STEFFEN; 8
wire or checking card transfers totaling $66,000 to JIM LOLLI;
and 2 wire transfers totaling $16,000 to JOHN BROMMEL.   A review
of travel records obtained from Southwest Airlines, Delta
Airlines, Continental Airlines, U.S. Airways, JetBlue, and
Frontier Airlines, show that between October 2004 and December
2011, FELIX KHA traveled by plane to various parts of China on
twelve occasions for an approximate total of fourteen months.
During February, May, August, September and November 2011, FELIX
KHA made 5 trips to Vietnam, 4 of which were made as part of a
trip in which he also visited China.   Between February 2009  and
May 26, 2011,  FELIX KHA traveled by plane seventeen times to
Missouri and six times to Texas.

41.   A review of MAI NGUYEN's bank records show 29 cash
deposits totaling $580,500 between December 2009 and March 2011
and 22 cash withdrawals totaling $160,000 between December 2009
and March 2011.   This influx of cash would appear inconsistent
with her nail salon business, JOLINE'S NAILS.   A review of travel
records obtained from Southwest Airlines, Delta Airlines,
Continental Airlines, U.S. Airways, JetBlue, and Frontier

Airlines show that MAI NGUYEN has traveled to Missouri 4 times and 1 time to Texas between February 2011 and August 2011.

42.   A review of records for bank accounts maintained by WADE STEFFEN, MERRILY STEFFEN, and MOLLY BLACKBURN (the STEFFEN GROUP), shows cash deposits and withdrawals.   WADE STEFFEN deposited $39,800 in December 2010 and then withdrew $30,000 that same month with which he purchased property in Hico, Texas. Between October 2009 and December 2011, WADE STEFFEN withdrew $214,000 in cash from a joint account that he holds with his mother, MERRILY STEFFEN.   For her part, MERRILY STEFFEN deposited $210,000 in cash between April 2010 and December 2011.   However, a review of travel records obtained from Southwest Airlines, Delta Airlines, Continental Airlines, U.S. Airways, JetBlue, and Frontier Airlines, strongly suggests that it corresponds to their trafficking of rhinoceros horns.   Between the dates of August 2009 and January 2012, WADE STEFFEN traveled by plane 9 times to Long Beach, California, as well as other domestic trips.   Between October 2010 and January 2012, MOLLY BLACKBURN traveled by plane 4 times to Long Beach, California, as well as other domestic trips.   Between July 2011 and January 2012, MERRILY STEFFEN traveled by plane 4 times to Long Beach, California.

a.   On February 16, 2012, I became aware that MAI NGUYEN has purchased a round-trip ticket for travel on February 19, 2012 from Ontario, CA to Kansas City, MO.

43.   A review of bank accounts maintained by JIM LOLLI shows that one account, LOLLI BROTHERS Livestock Special Sales at the Atlanta State Bank, has received 9 checks to WADE STEFFEN totaling $19,494, 3 checks to MOLLY BLACKBURN totaling $48,206, 14 wire transfers totaling $121,512 from FELIX KHA and/or JIMMY KHA, 51 cash deposits totaling for $935,961, and 2 internal transfers between accounts for $40,000, each in January 2011, with a note specifying that it pertained to a "surplus horn commission."

**F.**   **Undercover Transactions With WADE STEFFEN and JIM LOLLI**

44. On or about October 15, 2011, a USFWS Special Agent operating undercover ("UC1"), who was aware of JIM LOLLI's prior involvement in the rhinoceros trade contacted lollibros@lollibros.net asking for assistance with identifying a rhinoceros shoulder mount.   The email stated:

> I have ben to your sale in the past and I know you guys
> are experts and can help me.   I have a rino mount and
> people are telling me its White and someone than told
> me it is a black one.   I don't now who to believe.   If
> someone could look at the pics and tell me what it
> really is that would be great.   if I need to take other
> pics just let me know.

UC1 attached three photos of a shoulder mount of a Black rhinoceros.

45. On October 17, 2011, UC1 received a voice mail from JIM LOLLI's business line, stating to call him back.   On October 18,

2011, UC1 returned JIM LOLLI's voice mail and spoke with him. In

a recorded conversation, LOLLI stated about the photograph:

> That is a Black Rhino. No doubt, no question and it
> has to be sold in your state. Now if you want to sell
> it I've got people in your state that can buy it. It
> is limited to the high, high dollar figure but you
> could probably pretty good money. First of all you got
> to find out the weight of it, that's what's selling
> it's the horn. If we get the weight then I could tell
> you about what it's worth. Just say it's seven pound
> horn, I could probably for sure get you in the $25,000
> plus range. Got to get the weight of it and see who's
> available in Iowa. I know there's one guy available in
> Iowa cause I have had him pick up something before up
> there. That's the legal way. No matter who I say,
> whether you know me, who whatever, you got to get a
> drivers license from that person and get a copy of it.
> That keeps it legal for you. Now this guy might not
> want the head or he might want it. I don't know either
> way. If you want to, I can get it sold for you. I
> can't receive any commission, that's the way the law
> is. Somebody wants to give me a token of appreciation
> for something. I really don't care about that too
> much, because I get enough good enough anyhow to move,
> the White Rhinos. On the blacks I can't but I can
> refer you to somebody. If you wanted to buy me a coke
> one day you can do that. I'll guide you in the right
> direction on that…Go around the edge of it there ought
> to be a little plaster something around it. Kinda
> loosen it and see. If there's bolts, you might have to
> get a sawzall and cut them off. The main thing is you
> got to get the bolts out of the head so don't cut them
> too short so you can try to work them out of it so you
> can get an accurate weight. Those prices every ounce
> is worth so much. Work on that first and then we'll
> kinda go from there. I got a couple of different
> people that would be interested up in Iowa.

46. UC1 removed the horns from the rhinoceros mount, weighed

the horns and determined that the combined weight was 8 pounds 10

ounces. UC1 marked the two horns with invisible marking powder

and removed a small sample from the horn for DNA testing. In

addition, on November 1, 2011, UC1 submitted the small samples to

the USFWS Forensics Lab in Ashland, Oregon for identification.

The lab identified the horn samples as from Black rhinoceros.

47.  On October 19, 2011, UC1 received a voice mail from JIM

LOLLI from his business line, asking if UC1 had found out

anything and to call him back.  The next day, October 20, 2011,

UC1 returned a phone call to JIM LOLLI.  JIM LOLLI asked UC1 if

UC1 had the weight of the rhinoceros horns.  UC1 told JIM LOLLI

about sawing the bolts off too short and gave JIM LOLLI a weight

of 8 pounds 10 ounces.  UC1 told JIM LOLLI the weight of the two

complete lag bolts was 1.3 ounces.  JIM LOLLI then estimated the

accurate weight of the horns as 8 pounds 8 ounces.  JIM LOLLI

stated the following to UC1:

> Well I'm going to have a guy call you, if you're
> interested.  What do you want to try to get for them
> right there, they're worth somewhere between.  I ought
> to be able to get you $3,000-$4,000 a pound easy.  I
> think if you get around, let me figure something real
> quick.  I think if you get $25,000-$30,000 it would be
> good.  If they were whites and we could sell them out
> of the state I could probably get you $30,000-$40,000.
> I will tell you what I'll do.  I'll have a guy, just
> stick at $30,000.  Just see what he says and you don't
> have to tell him I told you.  I'm sure they will give
> it to you and the will probably come by and give you
> cash for it.  It's all legitimate but it has to be sold
> in your state.  The main thing is get a driver's
> license for this.  Just make sure it's an Iowa driver's
> license.  Sign a paper and just say this is who I am
> and have it sign it so you got the signature there.
> The same that's on the driver's license.  That will
> clear you and keep you in good shape on it.  These
> horns are sold in good faith as to a resident of the
> state of Iowa and have them sign it.

UC1 asked JIM LOLLI if UC1 could trust the referred buyers.   JIM
LOLLI responded as follows:

> Oh yea, no, no, no.   I trust the… I deal with them
> every day.  **Felix is the main guy** but he's got people
> everywhere that, but this is the only way to keep it
> legal.   So if he calls you just stick with what I told
> you and go from there.

(Emphasis Added).

48.   On October 20, 2011, UC1 received a voice mail from
MOLLY BLACKBURN (who had not yet married WADE STEFFEN and hence
is identified here as MOLLY BLACKBURN).   BLACKBURN stated:

> Hi..., this is MOLLY BLACKBURN and JIM LOLLI told me
> that you have a horn for sale and I was wondering if I
> could come get it from ya.  If you could call me back
> at 712-313-0331.    Thank you.

UC1 sent BLACKBURN a text message to this telephone number saying
that UC1 had received BLACKBURN's voice message and would call
the following day.  On October 21, 2011, BLACKBURN sent UC1 the
following text from 712-313-0331:

> Ok I don't have good service where I am at if you call
> please leave message.  I will call you back. Thanks.

49.   Later on October 21, 2011, UC1 returned a phone call to
BLACKBURN.   BLACKBURN answered and asked UC1 where UC1 lived.
BLACKBURN asked UC1 if he would be around the next Wednesday,
October 26, 2011.   BLACKBURN asked to meet on Wednesday and

stated that she was in Texas visiting family and would be flying

in on Tuesday and out again on Thursday. UC1 and BLACKBURN had a

discussion about the weight and price of the horns. BLACKBURN

asked UC1 how much money he wanted per pound and UC1 asked

BLACKBURN what she was willing to pay. BLACKBURN replied:

> It's a, actually I'm just running up and getting it for
> my fiancé. I'll have to ask him because I'm not sure.
> I don't even know what he pays for them. So, he is the
> one that actually talked to Jimmy [LOLLI]. He just
> wanted me to call you and wanted me to come get it
> because he is out of town for a few weeks.

UC1 then told BLACKBURN that JIM LOLLI had stated the horn was

worth $3,000-$4,000 per pound. MOLLY BLACKBURN replied that she

did not know prices but that she could have her fiancé talk to

him about "price and all that stuff." MOLLY BLACKBURN indicated

that her role would be to bring "cash" and pick up the horns once

there was an agreement on price.

50. On October 21, 2011, UC1 and BLACKBURN exchanged text

messages concerning a date to pick up the horn. BLACKBURN texted

that she would like to pick up the rhinoceros horn on October 29,

2011. UC1 sent a text message back that the first week of

November would work better. BLACKBURN replied that this would

work since they would be driving to Illinois that week and would

be going through Des Moines. BLACKBURN indicated that WADE

STEFFEN would call about setting up a deal.

51. On October 28, 2011, UC1 spoke with BLACKBURN.

BLACKBURN discussed meeting on November 2, 2011. BLACKBURN
indicated that she was aware that JIM LOLLI had told UC1 that the
price for the horn would be $30,000 and that she would let WADE
STEFFEN know. On November 1, 2011, UC1 left a message with
BLACKBURN asking BLACKBURN to call UC1. UC1 had received a call
from WADE STEFFEN, who left the message using his cellular
telephone. WADE STEFFEN stated that MOLLY BLACKBURN told him to
give UC1 a call. WADE STEFFEN and UC1 agreed to either meet
Wednesday or Thursday (November 2-3, 2011). WADE STEFFEN agreed
to call UC1 the following morning.

52.   Following additional calls and messages, UC1 and WADE
STEFFEN agreed to meet in Des Moines, IA on November 2, 2011. At
approximately 7:09 p.m. on November 2, 2011, a White Dodge Ram
1500, crew cab pickup bearing Illinois license plates arrived in
a Kmart parking lot on University Avenue to meet UC1. WADE
STEFFEN, who was driving, got out of the pickup and walked to
UC1's passenger window and introduced himself as "Wade." Another
unknown male individual got out of the rear driver side door.
UC1 asked WADE STEFFEN if he wanted to look at the rhinoceros
horn. UC1 also noticed a third male sitting in the front
passenger seat of the pickup. WADE STEFFEN and one of his
passengers inspected the rhinoceros horn. WADE STEFFEN asked UC1
about the price of the rhinoceros horn. UC1 told WADE STEFFEN
that, according to JIM LOLLI, it was worth $30,000. UC1 asked

-35-

WADE STEFFEN what he was willing to pay.  WADE STEFFEN turned to

his passenger and stated, "I don't know, what do you think."  The

passenger stated, "$20,000-$22,000."  UC1 told WADE STEFFEN that

both horns weighed 8.5 pounds.  After examining the horns, WADE

STEFFEN stated that he was going to eat and discuss the purchase

and call UC1 back.  WADE STEFFEN and the passenger then got back

into the Dodge pickup and left the parking lot.  UC1 waited

approximately 30 minutes for a return phone call from WADE

STEFFEN.  UC1 called and left a message on WADE STEFFEN's

cellular telephone requesting a return phone call.  WADE STEFFEN

did not return the call and UC1 left the parking lot.

    53.  On November 3, 2011, UC1 placed a phone call to JIM

LOLLI and left a message.  On November 4, 2011, JIM LOLLI called

UC1.  UC1 explained that he had an awkward meeting with WADE

STEFFEN that made him feel uncomfortable and that STEFFEN had not

purchased the rhinoceros horn.  During the call, JIM LOLLI stated

the following:

> Somebody is getting something kinda messed up...Wade is
> okay, him and Molly's fine.  I don't know who was with
> him.  He's a guy out of Iowa or wherever that takes
> care of things.  But the way I got it from the guy, the
> main guy that's buying.  He called me later and he said
> that Jeff Fuze was there, what's he doing there and he
> said that kinda spooked his guy.  So he left.  So let
> me see what's going on and I'll get you back ahold of
> ya' and see, that Molly and Wades okay.  They're the
> ones that I kinda expected to be there.  But I don't
> know what they were doing jacking around on their price
> like that...I tell you what you can do.  I mean I hate to
> do it this way.  If you wanted to bring it to me I

> could get a guy to pay you and then just not say
> nothing. I could get it gone. Maybe you would feel
> more comfortable. Alright, you just let me know when
> you can meet me somewhere half way and it will be me or
> my buddy Scott who works with me in here. You just let
> me know when. Those other guys, they do it for him but
> they have spooked some other. They are kinda' grubby,
> they're rammy a little bit they shouldn't ben even
> trying to deal with you. Well that's fine, I don't
> blame you one bit I would be the same way. I want
> everything to be on the up and up. I'll help you do
> something. You just let me know.

Later on November 4, 2011, UC1 called and told JIM LOLLI that he

would drive to Macon, Missouri and bring the rhinoceros horns.

JIM LOLLI agreed and stated: "Just let me know cause I got to get

the money for ya."

54. During a telephone conversation on November 7, 2011 UC1

informed JIM LOLLI that UC1 would visit JIM LOLLI at his business

in Macon, Missouri the following day. JIM LOLLI indicated that

UC1 should go to the trophy room and meet "Scott." The next day,

November 8, 2011, UC1 arrived at LOLLI BROTHERS LIVESTOCK MARKET,

located at 704 Main Street, Macon, Missouri, and walked to the

trophy room where he was invited inside by SCOTT DARIN ZIEBARTH.

ZIEBARTH removed the horns from the box and weighed them on the

scale. ZIEBARTH asked UC1 about the prior meeting with STEFFEN.

UC1 explained that it was awkward and he was concerned about his

safety. ZIEBARTH stated:

> That's really weird. Of course we always try to listen
> to everybody's stories whenever they. Because you
> know, this stuff, when your dealing with this much,
> that's kind of weird.

ZIEBARTH then dialed a number on his cellular phone and stated

into the phone that UC1 was at the trophy room.  ZIEBARTH then asked UC1 if WADE STEFFEN looked at the rhinoceros horns.  UC1 told ZIEBARTH that one of his passengers had examined the rhinoceros horn.  ZIEBARTH then stated:  "Well Jimmy just tried to get a, get somebody that would be in your state.  To work it out with ya'."  A short while later JIM LOLLI walked into the room and shook hands with UC1.  LOLLI asked ZIEBARTH, "You got' 'em in?"  ZIEBARTH responded, "They're in here and they're weighed, they're good."  UC1 then told JIM LOLLI about the meeting with WADE STEFFEN.  JIM LOLLI responded:

> Well you probably did the best thing.  You know those guys, I don't know who that other.  We deal with the main guy too and he's got people in every state.

JIM LOLLI also told UC1:

> Well I kinda try to keep all where it's pretty near legal. With their license and everything."

55.  After leaving the room for a short while, ZIEBARTH returned and removed three bundles of money from his sweatshirt pocket and laid the money on the table.  UC1 thanked JIM LOLLI and ZIEBARTH for buying the rhinoceros horn.  JIM LOLLI said, "Well go find some more horn."  UC1 told LOLLI that UC1 would look for more rhinoceros horn.  JIM LOLLI said:

> The blacks are a bad deal I would rather just keep a low profile on them things.  We try not to do much that's why we just rather set it up and have nothing to do with it.  I knew when you got spooked.  I said I'd just better take 'em, bring 'em to me.

- 38 -

56.   As part of OPERATION CRASH, I am aware of information provided by a Confidential Source ("CS1"). CS1 has identified JIMMY KHA and FELIX KHA as persons who CS1 knew to be purchasing rhinoceros horns in the 2008-2009 time period. After CS1 was under investigation for unrelated federal wildlife crimes CS1 claimed to have purchased White rhinoceros horns from a LOLLI BROTHERS auction. CS1 claimed, however, that when the horns were delivered, CS1 found that they were actually Black rhinoceros horns. CS1 then agreed to record a conversation with JIM LOLLI on January 6, 2010. During the recorded conversation, the following dialogue took place:

| | |
|---|---|
| CS1: | "Well, the fact that it's black, I mean I can't do nothing with the damned thing." |
| JIM LOLLI: | "Yeah, I know you see, you might as well send it back." |
| | . . . |
| CS1: | "Ya know, they're black.  Somebody slipped a black...." |
| JIM LOLLI: | "You might as well send it back and we will start over." |
| CS1: | "Okay, what the hell you gonna do with them? [inaudible]" |
| JIM LOLLI: | "[inaudible]  Sell them to FELIX." |
| CS1: | "Yeah, well. |
| JIM LOLLI: | "I mean, he don't really care, so.  I didn't mention nothing about black, just told him that was the one that was there.  I just I didn't tell him about you.  I just sold him the other horn I had." |
| CS1: | "Well, he bought the other three didn't he?" |

| JIM LOLLI: | "Yeah, he said if you wait on the money, he said I'll take it ..." |
|---|---|
| CS1: | "[laughs] Yeah, he called me Christmas but I didn't talk to him.  He just left a message but ..." |
| JIM LOLLI: | "He sells them one at a time ..." |
| CS1: | "Yeah, [laughs] I bet, I bet he gets the biggest ones first, right?" |
| JIM LOLLI: | "Yeah, he paid for one and a half, the other one he has about another $5,000 to pay on it then I will ship it to him ..." |
| CS1: | "Alright." |
| JIM LOLLI: | "He said he might take these other ones, but I have to wait for the money." |

57.  Based upon review of investigative reports received from another district, I am informed that a few days after the conversation described above, on or about January 13, 2010, JIM LOLLI was contacted by USFWS.  When confronted about the sale of the rhinoceros horns to CS1, JIM LOLLI acknowledged that he knew it was illegal to sell Black Rhinoceros and claimed that he believed he had sold horns of a Southern White Rhinoceros.  LOLLI also provided paperwork, including a purported affidavit from an individual identified by JIM LOLLI as the individual who had provided the horns.  In a later interview in March, 2011, JIM LOLLI indicated that he sells a lot of White Rhinoceros horn.  At no time during the interviews with USFWS, did JIM LOLLI indicate that he had sold Black Rhinoceros horns or that he had sold them to "Felix" as he had previously stated in the recorded conversation with CS1.

- 40 -

58.  On September 09, 2011, a USFWS SA working in an undercover capacity ("UC2") posted a message on a publicly available web page explaining he had an old Black rhinoceros mount and asked about repairing it to look new.  On November 12, 2011, LANCE JOWERS contacted UC2 by email.  As set forth herein, LANCE JOWERS sought to buy this mount.  I am informed that LANCE JOWERS is closely affiliated with WADE STEFFEN.  I am further informed that UC2 has engaged in a prior rhinoceros transaction with WADE STEFFEN involving rhinoceros horns which were subsequently shipped to JOLINE's NAILS.

59.  I am informed that on or about October 14, and 15, 2011, USFWS, Special Agents Leo Suazo and Michael Merida conducted a covert surveillance of the World Class Big Game Trophy Mount and Western Auction in Fort Worth, Texas, where three Black rhinoceros shoulder mounts were up for auction.  It was announced that only Texas residents could purchase the Black rhinoceros items.  The auction was conducted by JOHN BROMMEL, who also operates a storefront business in Austin, Texas, known as THE CORNER SHOPPE.  WADE STEFFEN did not bid on any of the Black rhinoceros mounts and did not appear to the agents to be associated with any of the other bidders.  However, SA Merida observed WADE STEFFEN meet outside in a nearby parking lot with the person who placed the winning bid of $31,000 on item #322, a Black rhinoceros shoulder mount.  That person was subsequently

- 41 -

identified through State of Texas driving license records as
LANCE JOWERS.  WADE STEFFEN and LANCE JOWERS got into a red Dodge
pickup with a livestock trailer attached. The livestock trailer
was determined to be registered to LANCE JOWERS of Hico, Texas,
and the Dodge pickup was determined to be registered to LANCE
JOWERS's wife.

   60.  The following day, on October 15, 2011, USFWS Special
Agents observed LANCE JOWERS enter the auction carrying a plastic
bag with a unique design.  WADE STEFFEN was not present at the
auction on October 15, 2011.  LANCE JOWERS then went to the
auction cashier, sat down next to the cashier behind the table
and was seen pulling large sums of cash out of the plastic bag.
During the second day of the auction, LANCE JOWERS bid on and won
the other two Black Rhinoceros mounts.  The winning bid for the
second mount was $19,500, registered as lot #716, and the third
was $30,500, registered as lot #761.  LANCE JOWERS then was
observed at the cashier with the same plastic bag.  After the
auction concluded, LANCE JOWERS was observed loading two of the
rhinoceros mounts into the cab of the red Dodge pickup and one
rhinoceros mount into the livestock trailer.  This was also
recorded on video tape by the agents.  In total, LANCE JOWERS
purchased three mounts with two horns each.  Two of the horns
were subsequently identified, less than ten days later, in a
package (which was identified in this case as SUBJECT PARCEL 9)

sent by UPS from MOLLY BLACKBURN in Texas to JOLINE NAILS. The horns were examined pursuant to a federal search warrant dated October 26, 2011, and compared to photographs and videos of the horns at BROMMEL's auction. Based upon photographic review of these horns by a USFWS Forensic Scientist, these horns were identified as being from Black Rhinoceros.

a. Another horn that was identified as having been purchased by LANCE JOWERS at the auction was found in a package (which was identified at SUBJECT PARCEL 10) that was sent from Stephenville, Texas by Fed Ex to JOLINE NAILS with no sender identified. That identified horn and another horn in the package were examined pursuant to a federal search warrant dated November 1, 2011. The identified from the auction, after testing by a USFWS Forensic Laboratory, was found to be from Black Rhinoceros.

61. LANCE JOWERS indicated that he was using two email accounts because he wanted to research UC2 and was concerned who he was dealing with since interstate sales of Black rhinoceros horns are illegal. During one conversation on November 20, 2011, LANCE JOWERS asked UC2 where he lived. UC2, while appearing agitated, questioned LANCE JOWERS about the inquiry and advised LANCE JOWERS that he was upset with the questions. LANCE JOWERS responded: "Let me tell you why I asked that before you get upset." JOWERS stated "Here's what I'm worried about. I don't know you, you don't know me. Ok? Those things, a black rhino

- 43 -

can only be traded in the state that it is in . . . the black rhino, that is mandated, you can only sell that black rhino in the State of Indiana, the state that it is in right now. So, I've got a really, really good friend that is in Indiana that wants, that, to get that mount…" LANCE JOWERS further stated "I don't know who you are, so I'm trying to figure, make sure you're, you're an Ok guy, you know what I mean. So I'm trying to do my own work on you, cause that's a lot damn money and I don't know you." LANCE JOWERS also stated, "A rhino is illegal to sell outside the State of Indiana. You already know I live in Chicago, around Chicago, so if you sold me that mount, that would be illegal. I could get in big trouble for that." UC2 suggested that the deal not happen, citing that he didn't want to get in any trouble. LANCE JOWERS attempted to reassure UC2 that he wouldn't get in trouble and stated "I've seen enough of these go down." LANCE JOWERS told UC2 that all that was needed was a "little affidavit" giving details about the rhinoceros and that UC2 was selling the black rhinoceros to someone in Indiana. LANCE JOWERS commented "that's all you need to do…that's what covers your ass." LANCE JOWERS then told UC2 that rhinoceros sold at auctions require similar affidavits. During the discussion, LANCE JOWERS stated "but if you were to sell that rhino to someone in Illinois and that rhino is in Indiana, that's, that's a no no…" JOWERS reiterated to UC2 that he would have his friend from Indiana pick up the rhinoceros mount and

- 44 -

provide UC2 with $20,000.00 cash.   LANCE JOWERS then told UC2

that both he and his friend would sign the affidavit transferring

ownership of the mount.   LANCE JOWERS stated "You can't get in

trouble as long as you do that…that's the deal.   You got to do

that on a black."   UC2 questioned LANCE JOWERS about using two

different email accounts to contact him.   LANCE JOWERS attempted

to explain that he felt he needed to check out UC2 and make sure

that "you ain't somebody trying to get somebody in trouble.   Does

that make sense? I don't know how else to explain it.   But a black

rhino is on the endangered species list.   You cannot go kill a

black rhino in Africa…they really, really, really control the

trade on the horns.   I'm being straight up honest with you…"

LANCE JOWERS then told UC2 that they could meet at any location

he preferred and "we'll do the deal."   LANCE JOWERS also stated

that he wouldn't continue to check on UC2 and would wait until he

contacted LANCE JOWERS to arrange the deal.   LANCE JOWERS stated,

"Just be careful on who you tell about the mount."

## CONCLUSION

62.   Based on the foregoing, I have probable cause to

believe that FELIX KHA, JIMMY KHA, MAI NGUYEN, and WADE STEFFEN

have committed several criminal violations of the federal

Endangered Species Act and Lacey Act related to illegal

interstate sales, transport, and acquisition of endangered

rhinoceros horn, and conspiracy to commit those crimes, including

- 45 -

the following: (1) Title 16, United States Code, Sections
1538(a)(1)(E), 1540(b) (interstate transportation of an
endangered species in the course of a commercial activity); (2)
Title 16, United States Code, Sections 1538(a)(1)(F), 1540(b)
(offering to sell or sale of an endangered species in interstate
commerce); (3) Title 16, United States Code, Sections 3372(a)(1),
3373(d)(1)(B), 1538(a)(1)(E), 1538(a)(1)(F), 1540(b) (knowing
transportation, sale, receipt, acquisition, or purchase of
endangered species with a market value in excess of $350 with
knowledge that the endangered species were delivered, sold,
carried, transported, or shipped in the course of commercial

//

//

//

- 46 -

activity and/or were sold or offered for sale in interstate commerce); and (4) Title 18, United States Code, Section 371 (conspiracy to engage in violations of the aforementioned statutes) including those set forth in the attached Statement of Counts One through Four.

LIZZ DARLING
Special Agent
United States Fish & Wildlife Service

Subscribed and sworn to before me on this ___16th___ day of February, 2012.

_____
UNITED STATES MAGISTRATE JUDGE

- 47 -